UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PAUL HINKENS,<br><br>  Plaintiff,<br><br>  v.<br><br>CA, INC.,<br><br>  Defendant. | Case No. 17-cv-910<br><br>Judge John Robert Blakey |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Paul Hinkens sued his former employer, Defendant CA, Inc., alleging that Defendant breached their compensation agreement, unjustly enriched itself, and violated the Illinois Wage Payment and Collection Act (IWPCA) by failing to pay him a commission for a specific sale. Defendant moved for summary judgment. For the reasons explained below, this Court grants the motion.

**I. Background**

The facts come from Defendant's Local Rule 56.1 statement of facts [38] and Plaintiff's statement of additional facts [45].

 **A. Plaintiff's Employment**

Defendant creates and sells computer software. [38] ¶ 2. Plaintiff started working for Defendant's sales team as an Account Director in August 2013. *Id.* ¶ 4. In that role, Plaintiff's responsibilities included ensuring client satisfaction and bringing in new clients or new contracts for existing clients. *Id.* Throughout his tenure, Plaintiff reported to Nona Schwabe, Senior Director of Sales. *Id.* ¶ 8. The

1

parties agree that Plaintiff worked for Defendant as an at-will employee. *Id.* ¶ 11.

Defendant paid Plaintiff an annual base salary, and also set individualized commission targets for Plaintiff through "incentive compensation schedules." *Id.* ¶¶ 12, 14. Plaintiff's fiscal year 2017 schedule—which covered the period from April 1, 2016 through March 31, 2017—set a quota of $5.1 million in "new contract value" (NCV) that Plaintiff had to bring in, and a target commission level of $150,000. *Id.* ¶ 18. The schedule explained that it "should be read in conjunction with the FY17 Incentive Compensation Plan," which contained "specific rules pertaining to the eligibility and the payment of commissions." *Id.* ¶ 17. Likewise, the compensation plan instructed employees that their schedule "shall form part of this Plan and should be read in conjunction with it." *Id.* ¶ 23.

Plaintiff understood that he had to review the compensation plan thoroughly as part of his job. *Id.* He also understood and agreed that the compensation plan provided the rules governing how Defendant paid commissions to its sales team. *Id.* ¶ 24. Plaintiff electronically signed his acknowledgement of receipt of his fiscal year 2017 schedule in April 2016. *Id.* ¶ 21.

Under the compensation plan, "continued employment at CA is a condition precedent to earning Commissions." *Id.* ¶ 27; *see also id.* ¶ 30 ("Participants will receive Quota Credit and Commissions for any other Metric for any eligible Transaction until the last day of employment."). The plan states that Defendant does not consider commissions "earned and payable" until a sales transaction qualifies as "fully completed," meaning: (1) the client pays all amounts due for the

first 12 months of its contract; (2) the client and Defendant satisfy all other requirements of their contract; and (3) Defendant audits the transaction. *Id.* ¶ 28. The plan provides one exception to the general rule that a transaction must be fully completed "prior to employment termination" for an employee to earn a commission: if the "only open condition" at the time of an employee's termination "is CA's receipt of payment from the Customer," then Defendant considers the commission "earned" if the customer fully pays within 90 days of the employee's termination. *Id.* ¶ 31.

B.    **Ensono Transaction and Plaintiff's Termination**

Plaintiff's lawsuit concerns a transaction between Defendant and Ensono, an IT outsourcer. *Id.* ¶ 34. In November 2015, Plaintiff started working with a team of eight fellow sales employees—including Schwabe, his boss—to get Ensono to renew a specific contract with Defendant. *Id.* ¶ 37. The team originally hoped to close the transaction by March 31, 2016 (the last day of the 2016 fiscal year), but negotiations with Ensono had not yet concluded then. *Id.* ¶ 38.

Around the same time that negotiations with Ensono started, Schwabe formally put Plaintiff on a 60-day performance improvement plan (PIP), set to expire on March 7, 2016. *Id.* ¶ 52. The PIP came as no surprise to Plaintiff after Schwabe gave him a rating of "Did Not Achieve Expected Results" on his March 2015 annual performance review. *Id.* ¶ 50. The PIP identified multiple performance issues, including that Plaintiff achieved only 7% of his NCV quota for fiscal year 2016. *Id.* ¶ 54. The PIP stated that Plaintiff could face termination if he

failed to meet the PIP's requirements. *Id.* ¶ 53. Plaintiff and Schwabe met weekly to discuss Plaintiff's progress while on the PIP. *Id.* ¶ 57.

Meanwhile, the Ensono negotiations continued. *Id.* ¶ 41. Schwabe met with Plaintiff in mid-April and extended his PIP for another 60 days, although she could have fired him at any time during those 60 days. *Id.* ¶ 59. In part, Schwabe extended Plaintiff's PIP because she hoped that the Ensono transaction would close within the extension period, allowing Plaintiff to earn a commission. *Id.* ¶ 60. After missing the March close, the Ensono team wanted to close by the end of April, but also missed that deadline. *Id.* As Plaintiff acknowledged at his deposition, his team had no certainty about when the transaction would close. *Id.* ¶ 44.

In mid-May, Schwabe emailed Plaintiff to tell him that he needed to show "significant" improvement to successfully complete the extended PIP. *Id.* ¶ 64. She also told Plaintiff that she would not extend the PIP any further if he failed to satisfy its requirements. *Id.* The Ensono transaction still had not closed by the end of May, so the team set a closing target date at the end of June. *Id.* ¶¶ 42–43.

Plaintiff's extended PIP expired on June 17, 2016. *Id.* ¶ 65. Schwabe fired Plaintiff that day because of his continued poor performance. *Id.* As of June 17, Ensono had not signed a contract and negotiations continued. *Id.* ¶ 46. Ensono signed within the next few weeks, however, and the transaction became fully complete on June 30. *Id.* ¶ 48. Defendant did not pay Plaintiff a commission for the transaction; it believed that he did not qualify for one under the compensation plan

since he no longer worked for Defendant when the transaction became fully complete. *Id.* ¶ 73.

A week or two before Plaintiff's firing, Schwabe discussed his impending termination with Carrie Horkavy in human resources. *Id.* ¶ 67. Horkavy asked about outstanding transactions; Schwabe explained that Ensono "was still out there," but said that she did not know when the deal would close, given how many times the closing date had moved back. *Id.* Horkavy testified that she asked about outstanding deals because Defendant sometimes waits "a day or two" to fire an employee if a deal might close in the near future. [45] ¶ 7.

## II. Legal Standard

Courts should grant summary judgment when the moving party shows that no genuine dispute exists as to any material fact and the evidence weighs so heavily in the moving party's favor that the moving party "must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see also* Fed. R. Civ. P. 56. A genuine dispute as to a material fact exists when, based upon the evidence, a reasonable jury could find for the non-moving party. *Anderson*, 477 U.S. at 248. To show a genuine dispute as to a material fact, the non-moving party must point to "particular materials in the record," and cannot rely upon the pleadings or speculation. *Olendzki v. Rossi*, 765 F.3d 742, 746 (7th Cir. 2014).

At summary judgment, courts must evaluate evidence in the light most favorable to the non-moving party and refrain from making credibility determinations or weighing evidence. *Rasho v. Elyea*, 856 F.3d 469, 477 (7th Cir.

5

2017) (citing *Anderson*, 477 U.S. at 255). The moving party bears the burden of establishing the lack of genuine disputes as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## III. Analysis

### A. Count I: Breach of Contract

Count I alleges that Defendant breached the parties' compensation agreement by refusing to pay Plaintiff a commission for the Ensono transaction. [1] at 8–9. Defendant argues that this claim fails because the compensation plan expressly provides that employees do not earn commissions after termination, and Plaintiff fails to show that any exceptions under Illinois law override the plan's express language. [39] at 7–10.

To succeed on a breach of contract claim, Plaintiff must show that: (1) the parties have a valid and enforceable contract; (2) Plaintiff performed under the contract; (3) Defendant failed to comply with a duty imposed by the contract; and (4) that failure to comply injured Plaintiff. *See Nielsen v. United Servs. Auto. Ass'n*, 612 N.E.2d 526, 529 (Ill. App. Ct. 1993). Under Illinois law, this Court may interpret unambiguous contracts as a matter of law. *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 821 (Ill. 2005). Illinois law instructs this Court to interpret unambiguous contract terms according to their "plain and ordinary meaning." *Barth v. State Farm Fire & Cas. Co.*, 886 N.E.2d 976, 982 (Ill. 2008).

#### 1. Interpreting the Compensation Plan

The parties had a valid and enforceable contract. Plaintiff understood and

agreed that the compensation plan—which incorporated his personalized incentive compensation schedule—set the rules for how Defendant paid commissions. *See* [38] ¶ 24; [38-4]; [38-5]. Plaintiff emphasizes the phrase "not a contract" that appears at the bottom of his fiscal year 2017 schedule, [46] at 10, but he takes that phrase out of context. In full, the provision reads: "This document is not a contract or guarantee of employment for any period of time and should not be construed as such. All CA employees are employed 'at will.'" [38-4] at 2. In context, that phrase plainly indicates that the schedule does not promise permanent employment; the phrase does not mean, however, that the schedule and compensation plan do not qualify as a contract for compensation purposes. *See Barth*, 886 N.E.2d at 982.

The compensation plan states: "Continued employment at CA is a condition precedent to earning commissions." [38-5] § 6. The plan explains that employees only "earn" commissions when a transaction reaches the "fully completed" stage, meaning it satisfies three conditions, including full payment of all amounts due within the first year. *Id.* § 6.2. Finally, the plan provides one exception to the general rule that terminated employees cannot earn commissions: if the only outstanding condition for the transaction to become "fully completed" is payment, Defendant considers a terminated employee to have earned a commission if the customer fully pays within 90 days of the employee's termination. *Id.* § 8.1D.

Taken together and interpreted according to their plain meaning, *see Avery*, 835 N.E.2d at 821, these provisions unambiguously show that Defendant did not breach any duty because Plaintiff failed to earn a commission on the Ensono

7

transaction. Per sections 6 and 8.1D, terminated employees cannot "earn" commissions (aside from the exception discussed above that does not apply here). Defendant fired Plaintiff on June 17, 2016. [38] ¶ 65. At that time, Ensono had not yet signed a contract. *Id.* ¶ 46. When the Ensono transaction finally closed at the end of June, *id.* ¶ 48, Plaintiff no longer worked for Defendant and could not earn a commission on the transaction, *see* § 6. And because negotiations with Ensono continued as of June 17, Plaintiff's situation does not fall within section 8.1D's exception for terminated employees who would have earned a commission but for the customer's failure to pay by the employee's termination date.

Plaintiff argues that his personalized compensation schedule "undeniably did *not* anywhere indicate that Mr. Hinkens had to be employed by CA on any date certain in order to receive a commission." [46] at 10. True, but the schedule incorporated the compensation plan, *see* [38-4] at 2 ("This Schedule is part of, and should be read in conjunction with, the FY17 Incentive Compensation Plan."), which plainly said that employees must still work for Defendant on the date a transaction becomes "fully completed" to earn a commission on that transaction, *see* [38-5] §§ 6, 6.2, 8.1D.

### 2. Plaintiff's Other Arguments

Plaintiff's complaint suggests that he earned a commission as the "procuring cause" of the Ensono transaction. [1] at 7. Under the procuring cause doctrine, "a party may be entitled to commissions on sales made after the termination" of employment "if that party procured the sales through its activities prior to

8

termination." *Technical Representatives, Inc. v. Richardson-Merrell, Inc.*, 438 N.E.2d 599, 602 (Ill. App. Ct. 1982). The doctrine does not apply, however, if a contract "expressly" provides when an employer will pay commissions. *Id.* Here, the procuring cause doctrine cannot help Plaintiff because the compensation plan expressly states the circumstances under which Defendant will pay commissions. *See* [38-5] §§ 6, 6.2, 8.1D.

Plaintiff argues in his response brief that he has a right to the commission because Defendant fired him specifically to avoid paying his commission. [46] at 3. This theory depends upon a violation of the implied covenant of good faith and fair dealing, *see LaScola v. U.S. Sprint Commc'ns*, 946 F.3d 559, 566 (7th Cir. 1991), which Plaintiff failed to plead in his complaint. Plaintiff may not amend his complaint through his response brief at summary judgment. *See Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 412 (7th Cir. 2009); *Griffin v. Potter*, 356 F.3d 824, 830 (7th Cir. 2004).

Even assuming Plaintiff sufficiently alleged an "avowedly opportunistic discharge," [46] at 3, he offers no evidence to support that claim. To succeed on this theory, Plaintiff would need to show "a discharge made in bad faith and intended to deprive the employee of the commissions." *LaScola*, 946 F.3d at 566; *see also Wilson v. Career Educ. Corp.*, 844 F.3d 686, 691 (7th Cir. 2016) ("The covenant of good faith and fair dealing requires only that discretion be exercised reasonably with proper motive rather than arbitrarily or capriciously or in a manner inconsistent with reasonable expectations."). Plaintiff's theory rests upon the

9

timing of his termination and the fact that Horkavy, Defendant's human resources representative, knew about the Ensono transaction but did not "hold off" on firing Plaintiff until the transaction closed. [46] at 3. Without more (and the record contains nothing more), such evidence fails to show that Plaintiff had a reasonable expectation that Defendant would refrain from firing him until he earned the Ensono commission. *See Wilson*, 844 F.3d at 691.

Horkavy testified that Defendant sometimes waited "a day or two" to fire someone who would soon earn a commission, not that Defendant always waited or that company policy required waiting for a matter of weeks. [38-10] at 14. Besides, Schwabe testified—and Plaintiff agreed—that no one working on the Ensono deal had any certainty about whether it would actually close by the end of June because of the numerous missed closings. *Id.* ¶¶ 44, 67.

Given Plaintiff's poor performance, it was patently unreasonable for him to expect that Defendant would continue employing him (an at-will employee) indefinitely until the Ensono transaction closed. In March 2015, Schwabe gave Plaintiff a rating of "Did Not Achieve Expected Results" on his annual performance review. *Id.* ¶ 50. She then put him on a 60-day PIP in early 2016. *Id.* ¶ 52. Plaintiff admitted that he was not surprised by the PIP because he "knew" that he was not "making his numbers." *Id.* When Plaintiff failed to meet expectations, Schwabe extended his PIP for another 60 days—through June 2016—in hopes that the Ensono transaction would close within that period, allowing Plaintiff to earn a commission. *Id.* ¶¶ 59, 60. By mid-May, Schwabe warned Plaintiff that he needed

10

to show "significant" improvement to satisfy the extended PIP, and that she would not extend the PIP any further if he failed to satisfy its requirements. *Id.* ¶ 64. Exactly as she warned Plaintiff, Schwabe fired him when the PIP expired on June 17 because of his continued poor performance. *Id.* ¶ 65.

As these facts show, Defendant gave Plaintiff multiple chances to improve his performance. *See id.* ¶¶ 59, 60. Contrary to Plaintiff's view, Schwabe's actions show the opposite of "a discharge made in bad faith and intended to deprive the employee of the commissions." *LaScola*, 946 F.3d at 566. Rather, Schwabe gave Plaintiff nearly four months to improve his performance, and even extended his PIP a second time hoping that he would earn a commission. Thus, this Court grants summary judgment to Defendant on Count I.

B.   **Count II: Unjust Enrichment**

Count II alleges that Defendant unjustly enriched itself by reaping the benefits of Plaintiff's work on the Ensono transaction without paying him a commission. [1] at 9. This claim fails because Illinois law does not allow unjust enrichment claims that rest upon the breach of an express contract. *See Shaw v. Hyatt Int'l Corp.*, 461 F.3d 899, 902 (7th Cir. 2006) (citing *Guinn v. Hoskins Chevrolet*, 826 N.E.2d 681, 704 (Ill. 2005)). As discussed above, the parties had a valid, enforceable contract—the compensation plan—that governed when Defendant paid commissions. Thus, this Court grants summary judgment to Defendant on Count II. *See Jackson v. Xerox Corp.*, 349 F. Supp. 2d 1119, 1124 (N.D. Ill. 2004)

(granting summary judgment to employer on an unjust enrichment claim because a wage agreement governed when the employer paid commissions).

## C. Count III: IWPCA Violation

Count III alleges that Defendant violated the IWPCA by withholding the commission that Plaintiff earned on the Ensono transaction. [1] at 10–11. Defendant argues that this claim fails for the same reason that Plaintiff's breach of contract claim fails. [39] at 11.

The IWPCA allows employees to seek "the timely and complete payment of earned wages"—including earned commissions—that their employer owes pursuant to an employment agreement. *Enger v. Chi. Carriage Cab Corp.*, 812 F.3d 565, 568 (7th Cir. 2016); 820 ILCS 115/2. As this Court explained above in interpreting the compensation plan, the parties' agreement unambiguously did not entitle Plaintiff to a commission for the Ensono transaction. Thus, Defendant did not owe Plaintiff any commission pursuant to an employment agreement. *See Enger*, 812 F.3d at 568. This Court grants summary judgment to Defendant on Count III.

## D. Count IV: Violation of the Illinois Sales Representative Act

Plaintiff concedes that he cannot pursue Count IV because he did not qualify as a "sales representative" under the Illinois Sales Representative Act, 820 ILCS 120/1. [46] at 13. Thus, this Court grants summary judgment to Defendant on Count IV.

## IV. Conclusion

This Court grants Defendant's motion for summary judgment [37] and enters judgment for Defendant and against Plaintiff. All dates and deadlines are stricken. Civil case terminated.

Dated: May 21, 2018

Entered:

_____
John Robert Blakey
United States District Judge
